ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6511
    Fax: (415) 436-7234
    George.Hageman@usdoj.gov

Attorneys for United States of America

**FILED**

Aug 15 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>CRAIG BOLLAND,<br><br>    Defendant. | **CASE NO. 3:23-cr-00238-VC**<br><br>**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION**<br><br>Date:  August 16, 2023<br>Time:  10:30 a.m.<br>Court:  Hon. Lisa J. Cisneros |

## I.    INTRODUCTION

Defendant Craig Bolland is a well-connected firearms manufacturer and dealer here in San Francisco.  His unassuming North Beach apartment is an armory for drug dealers and criminals throughout the Bay Area.  When law enforcement searched that apartment on May 30, 2023, they found five completed firearms (including two machineguns and one obliterated serial number), dozens of firearms parts, several boxes of ammunition, manufacturing equipment including a "Ghost Gunner 3" 3D printer, and drugs.  The defendant manufactures his own "ghost guns," deals firearms he obtains from a variety of sources out of state, brokers meetings between buyers and sellers, and conducts test-firing sessions at Fort Funston.  He claims to have been involved in deals for grenade launchers, Stinger missiles, and claymore mines.  Craig Bolland is a merchant of violence.  He arms those who spread

destruction in this city and beyond. Accordingly, the government requests he be detained pending trial based on danger to the community and risk of flight.

## II.    FACTUAL BACKGROUND

In January 2023, a suspect in a different case shot at a San Francisco police officer. Law enforcement investigated further and learned that the shooter had been communicating with the defendant, Craig Bolland, about the sale of firearms. Specifically, Bolland advertised that he manufactured ghost guns (both rifles and pistols) in his apartment using a Ghost Gunner 3 milling machine and test-fired his guns at Fort Funston. Bolland suggested encrypting texts to avoid detection.

On May 30, 2023, law enforcement executed a search warrant at the defendant's North Beach apartment. Inside, they found a motherload of completed firearms, including an Intratec TEC-9 pistol (with obliterated serial number), an AR-15 style rifle (fully automatic fire, with no serial number), a Glock 19 handgun (stolen from Nevada, with a "switch" designed to convert it to fully automatic fire), an IWI Masada handgun, and a Polymer 80 ghost gun (with no serial number). They found several boxes of ammunition in varying calibers. They found dozens of miscellaneous firearms parts: frames, receivers, and switches. They found firearms manufacturing equipment, including a drill press, a 3D printer, and a Ghost Gunner 3 milling machine—the same machine referenced in the previous texts. And, they found drugs, including fentanyl and methamphetamine, in individual plastic baggies.

  



The defendant was arrested outside of his apartment.  Though already in handcuffs, he leapt up and tried to sprint away before being tackled; later, he said he had to give it a try.  In a subsequent interview, the defendant admitted to both manufacturing and dealing firearms.  He said he had been doing it for the past two years, ordering parts online and using his manufacturing equipment to build handguns and rifles ("ghost guns").  He said he sold those firearms to local drug dealers, and had recently taken on more of a brokering role, connecting buyers and sellers, coordinating logistics for the handoff, and collecting a fee for his work.  He said he had customers interested in Stinger missiles, claymore mines, mortars, and grenade launchers.  He said he would test-fire the weapons at Fort

Funston in the middle of the night.  He said he was involved in transactions with "crates" of M-4 rifles.

## III.    LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove that both factors are present.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant is a danger to the community must be supported by clear and convincing evidence.  *Id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)."  *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).  Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including his character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that the defendant's release would pose.  *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The government has the right to a detention hearing when the case involves the possession of a firearm.  *See* 18 U.S.C. § 3142(f)(1)(E).  The rules of evidence do not apply at a detention hearing.  18 U.S.C. § 3142(f)(2)(B).  It is well-settled that at a detention hearing, the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors.  *See, e.g., United States v. Salerno*, 481 U.S. 739, 743 (1987).

## IV.    ARGUMENT

### 1.    The defendant poses a danger to the safety of any other person and the community.

When listing the factors to be considered at a detention hearing, Congress specifically required consideration of "whether the offense . . . involves a . . . firearm, explosive, or destructive device.  *See*

18 U.S.C. § 3142(g)(1). Here, there is not just one firearm but several: *five* completed firearms including one with an obliterated serial number (the TEC-9), two ghost guns (the AR-15 and the P80), and two machineguns (the Glock 19 and the AR-15). It also involves *several dozen* firearms parts, including frames and receivers which constitute "firearms" for U.S.S.G. § 2K2.1 purposes. While all firearms are dangerous, the defendant's collection is particularly so: the fully automatic firearms are designed to put as much lead downrange as possible; the obliterated serial number allows the shooter to avoid tracing; the ghost guns allow the shooter to avoid registration of any sort.

The defendant did not just possess firearms; he dealt them as well. And he didn't just deal firearms already on the black market. He *added* to the black market by manufacturing his own firearms, using various Polymer 80 parts and various manufacturing equipment (like his drill press, his 3D printer, and his Ghost Gunner 3). He was so much more than a passive mechanic toiling away in his workshop. He went out and test-fired his wares at Fort Funston within the city limits of San Francisco. He brought customers there to test-fire them as well. He stored these firearms in his apartment—unlocked and unsecured—and then dealt them, for profit, to buyers whom he knew (again by his own admission) were involved in criminal activity of their own.

Although the Ninth Circuit considers the weight of the evidence to be the least important statutory factor, this Court is still required to consider it. *See United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that defendant would pose a danger if released). Here, the weight of the evidence is overwhelming. The firearms, firearms parts, ammunition, and manufacturing equipment were all found in the defendant's apartment where he lived alone. He admitted, in his Mirandized and recorded post-arrest interview, to manufacturing and dealing a variety of firearms, and to possessing a number of firearms including the Glock 19, even expressing frustration at how the fully automatic "switch" didn't function as intended.

As for the defendant's personal history and characteristics, he reports turning to firearms manufacturing and dealing after being laid off during COVID. In just those two years, he has developed such extensive connections with drug dealers and thieves in the Bay Area (his primary customers according to him) that he is able to facilitate cross-state transactions for "crates" worth of weaponry.

Though he disclaims a drug addiction of his own, the search of his apartment found several different types of controlled substances (possibly received as payment for some of his past weapons transactions). In short, the defendant turned his personal employment troubles into a lucrative business intersecting with multiple criminal underworlds.  If released after being charged with a federal crime—an even more significant life event than getting laid off—he is likely to return to that business and continue to pose a danger to the community.

## 2.   The defendant poses a risk of flight by a preponderance of the evidence.

The defendant is a citizen of the United Kingdom and a lawful permanent resident of the United States.  During the search of his apartment, officers found his passport, his green card, and (suspiciously) somebody else's social security card.  The defendant even fled from police even after he was handcuffed, telling police later that he had to give it a try.  If released, there is a reasonable chance that the defendant will again "give it a try" again using his established connections to various criminal organizations.  This is all the more likely because of the serious penalties he faces: his guidelines range is 87-108 months for the firearms alone.  That severe penalty—more severe than any penalty he has faced to date—creates a strong incentive for the defendant to flee immediately if released.  *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (strong evidence of guilt "makes it more likely that he will flee").

## V.    CONCLUSION

There is no condition or combination of conditions that can assure the defendant's appearance or the safety of the community.  Accordingly, the Court should order the defendant detained pending trial.

DATED:  August 14, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


*/s/ George O. Hageman*
GEORGE O. HAGEMAN
Assistant United States Attorney